## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in January 8, 2016**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.** _____ |
| | : | |
| | : | **Indictment** |
| **v.** | : | |
| | : | **Violations:** |
| | : | |
| **JOHN T. FITZGERALD,** | : | **18 U.S.C. § 1343** |
| | : | **(Wire Fraud);** |
| | : | **18 U.S.C. § 1028A** |
| **Defendant.** | : | **(Aggravated Identity Theft);** |
| | : | **26 U.S.C. § 7201** |
| | : | **(Tax Evasion);** |
| | : | **18 U.S.C. § 1956(h)** |
| | : | **(Conspiracy to Engage in Monetary** |
| | : | **Transactions in Property Derived From** |
| | : | **Specified Unlawful Activity);** |
| | : | **18 U.S.C. § 1957** |
| | : | **(Monetary Transactions in Property** |
| | : | **Derived From Specified Unlawful** |
| | : | **Activity)** |
| | : | |
| | : | **FORFEITURE:** |
| | : | **21 U.S.C. § 853; 18 U.S.C. § 982;** |
| | : | **28 U.S.C. § 2461; 18 U.S.C. § 981** |

## INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At times material to this Indictment:

## GENERAL ALLEGATIONS

### Individuals and Entities

1.      Company A was an American multinational investment banking firm that engaged in global investment banking, investment management, and other financial services. Since 2000, Company A-1 was a wholly-owned subsidiary of Company A. Among other things, Company A engaged in real estate finance and development through Company A-1 (for ease of reference, Company A and Company A-1 are hereinafter collectively referred to as Company A).

2.      The Defendant JOHN T. FITZGERALD was employed by Company A as a vice president in Company A's Washington, D.C. office. The Defendant worked for Company A as a salaried employee from in or around September 2008 to in or around January 2014. The Defendant oversaw Company A's real estate development activities and investments, including in the Washington, D.C. area. In that capacity, the Defendant had authority to identify and engage contractors for certain aspects of development projects and to approve construction-related invoices on behalf of Company A. Company A generally prohibited its employees, including the Defendant, from working on other projects or for other companies while employed by Company A.

3.      The Defendant was the sole owner of a limited liability company initially named Fitzgerald Development, LLC, which was later changed to Onsight Management, LLC ("Onsight Management").

4.      Bryan D. Wright ("Wright") was the president of Blackwood of DC, LLC ("Blackwood of DC"), a commercial concrete contracting company located in Washington, D.C. Wright also maintained a related entity known as Blackwood One, Inc. ("Blackwood One"). Additionally, Wright was president of, and controlled, P&E Services, LLC ("P&E Services").

2

5.     Person 1 was in the business of providing construction management to owners and developers of real estate projects, including from the design and permitting phase through completion of projects. A person who provides such services is sometimes called an owner's representative. Person 1 provided these services through a company he owned (for ease of reference, Person 1 and his construction management company are collectively referred to as "Person 1").

6.     Person 2 was in the business of real estate development and management, and at times engaged in real estate development with the Defendant directly and personally. Person 2 also occasionally provided real estate management and consulting services, including construction management services similar to those provided by Person 1. Person 2 provided construction consulting and construction management services through a company he solely owned (for ease of reference, Person 2 and his consulting and construction management company are collectively referred to as "Person 2").

7.     Company B was one of the nation's largest construction management and general contracting companies and was based in Baltimore, Maryland. Company A engaged Company B to provide construction services on real estate development projects in the Washington, D.C. area. Prior to joining Company A, the Defendant worked for Company B.

8.     Company C was a United States-based multinational corporation that provided telecommunications network products, software, and services to private and governmental institutions. Company C was headquartered in Maryland.

**Properties**

9.     Station Ridge was a three-building office campus on Ridge Road in Hanover, MD. The Ridge Road addresses for the three buildings were 7031, 7035, and 7037. Each building had

three floors, and each floor had approximately 30,000 square feet of leasable space. Company A and certain third-party investors formed a special purpose entity in order to own and develop Station Ridge. That special purpose entity was the legal owner of Station Ridge. For ease of reference, the special purpose entity that owned and developed Station Ridge will also be referred to as Company A, given that Company A was the managing investor-owner on the project. The project generally progressed as follows:

        a.      Prior to construction at Station Ridge, engineering, architectural design, and permitting were completed. The plan for Station Ridge was to construct four office buildings in two phases, but ultimately Company A only built three buildings: two buildings during Station Ridge Phase I (7035 and 7037 Ridge Road), and one building during Station Ridge Phase II (7031 Ridge Road). In general terms, these two construction phases at Station Ridge were further broken down into base-building portions, which involved certain site work and construction of shell buildings, and tenant buildout portions, which further involved outfitting interior space (and on occasion certain additional base-building or site modifications) for use as offices by specific tenants.

        b.      In or before 2008, Company A engaged Person 1 to perform construction management services on the design and permitting for the Station Ridge project, as well as on the base-building work during Station Ridge Phase I. At that time, the Defendant did not yet work for Company A.

        c.      When the Defendant first came to work at Company A in or around September 2008, the Station Ridge development project was already underway. The Defendant then oversaw the project for Company A, and the Defendant asked Person 1 to reduce the scope of Person 1's work on the project. The Defendant informed Person 1 that

4

the Defendant intended to take a more active role in managing the project than the Defendant's predecessor on the project for Company A.

      d.      In or around November 2010, Company A engaged Person 2 as construction manager on the buildout of one floor of 7037 Ridge Road, which the Transportation Safety Administration ("TSA") had agreed to lease (the "TSA Buildout"). In or around July 2011, Person 2 executed a contract with Company A in which Person 2 agreed to provide construction management services on the TSA Buildout, although Person 2 had been performing construction management on that project since in or around November 2010.

      e.      In or around August 2011, Company A engaged Wright as construction manager on the base-building project for Station Ridge Phase II, which ultimately was a single building, 7031 Ridge Road (the "7031 Base-Building"). In or around November 2011, Wright, through P&E Services, executed a contract with Company A in which Wright agreed to provide construction management services on the 7031 Base-Building. Approximately one month later, the Defendant and Wright discussed Wright becoming construction manager on the buildout of three floors of 7035 Ridge Road, and all or portions of three floors of 7031 Ridge Road, all of which Company C had agreed to lease (the "Company C Buildout"). Company A engaged Wright to perform construction management services on the Company C Buildout. Company A and Wright did not, however, enter into a separate contract for the Company C Buildout.

      f.      On various dates in or around 2010 and 2011, Company A entered into contracts with Company B for contracting work on the TSA Buildout, the 7031 Base-Building, and the Company C Buildout. Previously, another large commercial contracting firm had performed the base-building work on Station Ridge Phase I.

5

g.      Company A sold Station Ridge in the fall of 2016 for approximately $57 million.

10.     Bridgewater Corporate Center ("Bridgewater") was an eight-story office building in Fairfax, Virginia at the intersection of Waples Mill Road and Random Hills Road. Company A was the developer and owner of Bridgewater. Company A began construction of Bridgewater in or around 2004, and completed construction in or around 2007. Wright's company, Blackwood of DC, performed work on Bridgewater dating back to in or around 2006.

### Financial Institutions and Accounts

11.     The following were financial institutions, as defined in Title 18, United States Code, Sections 20 and 1956(c)(6), and Title 31, United States Code, Section 5312(a)(2):

a.      TD Bank, N.A. ("TD Bank");

b.      Manufacturers and Traders Trust Company (also known as M&T Bank) ("M&T Bank");

c.      Bank of Georgetown.

12.     Bryan Wright was sole signatory over an account in the name of P&E Services at TD Bank, with account number ending 8277 (the "P&E Account").

13.     Blackwood of DC maintained an account at M&T Bank, with account number ending 2595 (the "Blackwood of DC Account").

14.     Blackwood One maintained an account at M&T Bank, with account number ending 3205 (the "Blackwood One Account").

15.     The Defendant was sole signatory over an account in the name of Onsight Management at Bank of Georgetown, with account number ending 9442 (the "Onsight Management Account").

16.     The Defendant was sole signatory over an account in his name at Bank of Georgetown, with account number ending 9885 (the "Defendant's Personal Account").

## COUNTS ONE THROUGH THREE
### (WIRE FRAUD)
### (18 U.S.C. § 1343)

17.     Paragraphs 1 through 16 are incorporated here.

### The Scheme

18.     From in or around mid-2010 to in or around June 2013, the Defendant JOHN T. FITZGERALD devised and intended to devise a scheme to defraud Company A on projects the Defendant oversaw as an employee of Company A, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Manner and Means

It was part of the scheme that:

#### *The Defendant Proposed to Person 2 That They Split the Construction Management Fees on the TSA Buildout*

19.     In or around the summer of 2010, the Defendant approached Person 2 about performing construction management work on the TSA Buildout.  The Defendant proposed to Person 2 that the Defendant would work with Person 2 in accomplishing some of the construction management tasks, and Person 2 and the Defendant would split the fees paid by Company A to Person 2.  Person 2 informed the Defendant that Person 2 was not comfortable with this fee-splitting arrangement, and that Person 2 would not engage in this conduct.

20.     Nevertheless, on or about November 11, 2010, Company A, at the Defendant's direction, engaged Person 2 to act as construction manager on the TSA Buildout.  The TSA Buildout included certain tasks required to finish certain aspects of the base-building.  The total cost associated with the TSA Buildout was approximately $2.33 million.  The contract between

Company A and Person 2 described the services Person 2 was required to provide, which generally were "the day-to-day management, maintenance and operation of the [TSA Buildout], and for planning and coordinating all of the activities required for the on-time and on-budget completion of the [TSA Buildout]." The contract stated that Person 2 would be paid $45,000 plus reimbursibles. Person 2 understood his payments were based upon an agreed hourly rate.

21.    Person 2's work on the TSA Buildout was nearing completion in or around May and June 2011. At around that time, the Defendant informed Person 2 that the budgeted maximum fee had been reached for Person 2's work. Nevertheless, Person 2 worked on the project until its completion.

### The Defendant Posed as Wright to Obtain Money from the TSA Buildout

22.    In or around June 2011, the Defendant began to invoice Company B for TSA Buildout construction management himself. The Defendant took steps to conceal the fact that he was simply invoicing Company B and taking money from the TSA Buildout project, as described further below.

23.    On or about May 13, 2011, the Defendant opened a P.O. Box in the name of Onsight Management in Arlington, VA.

24.    On or about May 20, 2011, the Defendant changed the name of his solely-owned LLC from Fitzgerald Development to Onsight Management.

25.    On or about May 28, 2011, the Defendant created an email account, onsightmanagementllc@gmail.com, in Wright's name, but without the approval, authorization, or knowledge of Wright.

26.    The Defendant thereafter used the onsightmanagementllc@gmail.com account to pose falsely as Wright, without Wright's approval, authorization, or knowledge. For example, on

or about May 28, 2011, the Defendant, posing as Wright, sent an email to himself at the Defendant's own Company A email address, stating:

> John,
>
> I received your message yesterday and have revised the April and May [Onsight] Invoices to [Company B]. We have not worked with them to date, however, we are very excited about the prospect of working with them on the next phase of the DHS at Ridge. Also, we did receive payment for March. I sent you our proposal for the next TSA RFP as well as [another] project. Please let me know if you have any questions regarding these proposals.
>
> I sent the SLA's to the TSA and have not received their response yet. I will follow up with them on Tuesday.
>
> Thank you,
>
> Bryan
>
> ONSIGHT MANAGEMENT LLC

27.     Through this email, the Defendant created and transmitted a record falsely indicating that Wright was affiliated with Onsight Management, that Wright was submitting invoices for Onsight Management related to the TSA buildout, and that Wright had not previously worked with Company B  (Wright and his concrete business had worked with Company B on several occasions in the past).

28.     On or about June 22, 2011, the Defendant submitted, or caused to be submitted, a false Internal Revenue Service ("IRS") Form W-9 to Company B.  Forms W-9 are used by individuals or companies who are making a payment to another person or entity, to gather taxpayer identification information of the payment recipient in order to facilitate proper tax reporting on the part of the payer.  In this instance, Company B was going to pay Onsight Management pursuant to the invoices the Defendant had submitted, and Company B sought to gather Onsight Management's taxpayer identification information on a Form W-9.  On the W-9 submitted to

Company B, Onsight Management's name and information appears. In the signature block, where an authorized person was supposed to sign the W-9 for Onsight Management, the signature falsely read: "B. Wright." Wright never signed this form, never authorized anyone to sign his name to this form, and was not himself authorized to sign forms or any documents for Onsight Management.

29.     The Defendant sent nine TSA Buildout-related invoices to Company B from Onsight Management. Those invoices falsely listed Wright's name, phone number, and/or the onsightmanagementllc.com email address. Those invoices stated that they related to work performed in April, May, June, July, August, and September 2011. Those invoices resulted in three payments from Company B to Onsight Management on July 5, 2011, July 11, 2011, and October 21, 2011, totaling $41,025.

30.     The Defendant deposited these payments into the Onsight Management Account, and used the money for personal expenditures. Each of the three checks was falsely endorsed on the back in the name of Wright, without Wright's knowledge or permission, thereby further concealing from Company B, the check maker, that the Defendant was taking money from the TSA Buildout.

31.     As the Defendant knew pursuant to his job as the Company A employee overseeing the Station Ridge development project, Company A, as the Station Ridge owner, reimbursed Company B for its costs on the Station Ridge project, including the $41,025 paid to Onsight Management for the TSA Buildout.

### The Defendant Installed Wright as
### Construction Manager on the 7031 Base-Building

32.     In or around mid-2011, the Defendant approached Wright and asked if he would be interested in serving as construction manager on the 7031 Base-Building. Wright expressed

interest. Fitzgerald informed Wright that the work involved representing Company A in its interactions with the contractor, Company B, and such things as attending project meetings, addressing construction issues, serving as construction expert, "value engineering" the project, and ensuring that the project was completed within its 14-month timeframe.

33.    On or about November 11, 2011, in the District of Columbia, Wright, on behalf of P&E Services, signed a contract with Company A, in the presence of the Defendant, to perform construction management work on the 7031 Base-Building. The fee payable to P&E Services under this agreement was stated as $365,000. The total 7031 Base-Building project cost was estimated in the contract at $10,000,000. Among other things, the agreement required Wright/P&E Services to inspect the project, maintain books and records for the project, attend meetings related to the project, prepare and submit monthly project reports to Company A, and provide accounting services related to the project. The contract also stated that "[a]ny notice, request, demand, approval or consent" pursuant to the contract should be addressed to the Defendant.

34.    On November 17, 2011, in the District of Columbia the Defendant created an email account, pandeservicesus@gmail.com, in Wright's name. At the same time, the Defendant listed on the email account an "alternate" email address for the account, which was pandeservices.us@gmail.com. The Defendant made Wright aware of the existence of this email account, but the Defendant never provided Wright access to it, nor did Wright use it. Instead, the Defendant used this account to pose as Wright at various times throughout the scheme involving Station Ridge Phases I and II. For example, on March 6, 2012, the Defendant sent an email from the pandeservices.us@gmail.com account to his own Company A email account, copying an individual who worked at Company B, stating: "John. Got your vm this morning. I will be there

thursday." The signature block on this email, which appears to have been inserted automatically by the sending device, contained the Defendant's own work contact information.

### *The Defendant Further Installed Wright*
### *as Construction Manager on the Company C Buildout*

35.     In or around late-summer 2011, near the conclusion of Person 2's work on the TSA Buildout, Company C was considering leasing office space at Station Ridge. At or around that time, the Defendant informed Person 2 that Company A might engage Person 2 as construction manager on the expected Company C Buildout. Subsequently, however, the Defendant told Person 2 that an independent construction manager was not necessary on the Company C Buildout because, unlike on the TSA Buildout, the incoming tenant was a private (non-governmental) entity. This was false and misleading. Thereafter, Person 2 was not engaged as construction manager on any further aspect of Station Ridge.

36.     On or about October 13, 2011, the Defendant directed Company B to budget $300,000 for P&E Services as construction manager on the expected Company C Buildout (broken down as $125,000 for the tenant buildout of building 7031; and $175,000 for the tenant buildout of building 7035). Around this time the Defendant also directed Company B to budget $100,000 for P&E Services as construction manager on the 7031 Base-Building. Thus, the Defendant directed Company B to budget a total of $400,000 for Wright's construction management services on these projects.

37.     On or about November 3, 2011, Company C signed a lease with Company A for space at Station Ridge. The lease called for "a third party" construction manager on the tenant buildout, who would receive a fee equal to 3% of construction costs.

38.     On December 14 and 21, 2011, Company A engaged Company B as contractor for the 7031 Base-Building and Company C Buildout, respectively.

39.     Two contracts between Company A and Company B related to the Company C Buildout listed P&E Services as the construction manager for Company A.

40.     In or around December 2011, the Defendant informed Wright that Wright would also be engaged to perform construction management work on the Company C Buildout.

41.     While Company B budgeted $400,000 for P&E Services, due to such things as change orders, Company B ultimately paid P&E Services a total of just over $417,000 on these projects.  As the Defendant knew, Company A was obligated to, and did, reimburse Company B for these payments to P&E Services.

*The Defendant and Wright Agreed to Split*
*Construction Management Fees Using False Invoices*

42.     With his scope of work expanded substantially to include the 7031 Base-Building and the Company C Buildout, Wright did not have the capacity to perform all of the tasks required of him as construction manager.

43.     When Wright expressed concerns about this to the Defendant, the Defendant stated that he would assist in performing Wright's duties, and they would split Wright's fees on the projects.  Wright expressed concerns to the Defendant about whether a fee-splitting arrangement like this was legal, and the Defendant falsely informed Wright that Company A allowed this, and that Wright should not worry about it.  Wright agreed to the fee-splitting arrangement despite continuing to believe it was inappropriate.

44.     The Defendant prepared P&E Services' invoices, which he submitted to Company A and Company B.  In the invoices, the Defendant misrepresented the work that Wright was actually performing as construction manager.

45.     The Defendant then sent invoices to P&E Services from Onsight Management, thereby specifying the funds Wright was to kick back to the Defendant from P&E Services' fees

on Station Ridge.  In turn, Wright paid the Defendant a significant portion of the money that P&E Services received for acting as construction manager.

46.    The Defendant included on these Onsight Management invoices generic or otherwise false descriptions of the services the Defendant claimed Onsight Management provided to P&E Services.  For example, on an $8,725 invoice dated November 11, 2011,  the Defendant stated that Onsight Management had provided to P&E Services "Misc. consulting services for varies [sic] projects."  Also by way of example, on a $42,983 invoice dated August 20, 2012, the Defendant stated that Onsight Management had provided to P&E Services "Hotel Site Inspection" services.  The Defendant and Onsight Management never provided "Hotel Site Inspection" services to P&E Services, yet the Defendant included that description on at least four invoices from Onsight Management to P&E Services totaling $146,489 in 2012.

47.    In or around early 2012, Wright realized the amounts on the P&E invoices that the Defendant prepared were increasing substantially, while at the same time Wright was not doing substantially more work.  Later, when Wright expressed concerns about the amounts of payments they were receiving on the Station Ridge projects, the Defendant told Wright there would be too many questions if Wright left the project, which could create problems for them both.  Wright stayed on the project, and continued to split his fees with the Defendant.

### The Defendant and Wright's Phony Invoices to Obtain Money for the Defendant to Buy Land in Virginia

48.    On or about April 30, 2013, the Defendant sent Wright a text message, stating in part:

> Also need huge favor.  I'm buying some land and need deposit.
> Can I send blackwood a 49 k invoice from me and one to us for
> 49 k that we will pay you for.  Once you get that check can pass
> the full Amount to me for this one.  There would be no taxes as

u will have an invoice from me for the same amount.  Will make
worth your while in near future.  Thanks.

Then, on May 28, 2013, the Defendant followed up with the following text message to Wright:

"We got funded for that invoice to blackwood dc.  They may call [Blackwood's Controller] to get

a w9 so you may want to give [her] a heads up.  Thanks again for doing this one.  Close on land

June 18th."  On June 3, 2013, the Defendant sent Wright a further text message stating: "The check

was mailed to blackwood on 5.29.  Can u let me know when it comes so I can run over and pick

up check.  Thanks."

49.     The Defendant and Wright created phony Onsight Management and Blackwood of

DC invoices in furtherance of this scheme to get money from Company A so the Defendant could

buy "some land."   No services had been provided to justify the payments requested by these

invoices.

50.     In connection with these phony invoices, on or about May 29, 2013, Company A

sent Blackwood One a check for $46,699.

51.     On or about June 3, 2013, Wright then signed a check from Blackwood One to

Onsight Management for $46,699, which the Defendant personally picked up from Wright on or

about June 4, 2013, in the District of Columbia.  The Defendant deposited this check into the

Onsight Management Account in the District of Columbia.  The Defendant did in fact purchase

real estate in Virginia in or around June 2013, using the proceeds of this scheme.

### *Summary of the Scheme With Wright on Station Ridge*

52.     In summary with regard to Wright's ostensible work on Station Ridge, under three

contracts with or naming P&E Services, the Defendant and Wright: (1) obligated Company A to

pay P&E Services a total of $365,000 for construction management work; (2) requested and

obtained a total of $769,000 in payments from Company A to P&E Services; (3) obligated

Company B to pay P&E Services a total of $400,000 for construction management work, which was reimbursable by Company A; and (4) requested and obtained a total of $417,000 in payments from Company B to P&E Services, which was reimbursed by Company A. The total of Station Ridge-related payments obtained by Wright/P&E Services from Company A and Company B was thus $1,186,000. Wright, through his companies, paid the Defendant, through Onsight Management, $598,475 in proceeds from the Station Ridge project, which is roughly half of the total amount that P&E Services obtained.

### The Defendant and Wright Engaged in a False Invoicing Scheme on Bridgewater

53.     During the time the Defendant and Wright were engaged in a scheme to fraudulently obtain money on the Station Ridge Project, the Defendant and Wright also engaged in a scheme to fraudulently obtain money on Bridgewater as described below.

54.     On or about November 11, 2011, the Defendant submitted a P&E Services invoice to Company A in the name of Wright, for $17,450 related to concrete pipe/inlet replacement and repairs at Bridgewater. P&E Services performed no such work at Bridgewater.

55.     On or about November 11, 2011, a disbursement approval signed in the Defendant's name authorized payment of $17,450 in connection with the phony P&E Services Bridgewater invoice.

56.     On or about December 22, 2011, Company A issued a check for $17,450 to Wright to pay the phony P&E Services Bridgewater invoice.

57.     Wright and the Defendant agreed to split the $17,450. On or about December 23, 2011, Wright signed a Blackwood of DC check payable to Onsight Management, a portion of which was the Defendant's half of the $17,450, and the remainder of which was to cover payments owed to the Defendant pursuant to the Station Ridge scheme.

58.     On or about August 24, 2012, at the Defendant's direction Wright sent the Defendant a phony proposal for work by Blackwood One at Bridgewater. The work was described as related to repaving a roadway, with a listed cost of $39,754.

59.     On or about September 20, 2012, Wright and the Defendant submitted to Company A an Application and Certification for Payment on behalf of Blackwood One seeking payment of $49,854 for the repaving work. Wright and his companies had done no such repaving work.

60.     On or about October 10, 2012, a disbursement approval signed in the Defendant's name authorized payment of $49,854 to Blackwood One for the repaving work it had not done.

61.     On or about October 25, 2012, Company A issued a check to Blackwood One for $49,854.

62.     On or about November 1, 2012, Wright signed a check from Blackwood One to Onsight Management for $24,927, half of the amount received for the phony repaving work. The Defendant endorsed this check and deposited it into the Onsight Management Account.

*The Defendant Closely Monitored and Managed the Proceeds of His Fraud*

63.     The Defendant frequently monitored and managed the invoices and checks involved in his scheme, including those ostensibly in Wright's name. For example:

        a.      In or around June 2011, in connection with the Defendant's scheme to obtain funds from the TSA Buildout, the Defendant emailed a Company B employee from the Defendant's Company A email account falsely claiming that Wright was looking for his payments on certain invoices. The Company B employee stated that the invoices "are being processed" and that he and the Defendant could meet to discuss "the unassigned cost," indicating that these were not originally-budgeted payments. On or about June 21, 2011, Company B stamped the invoices as received, and thereafter paid those invoices.

17

b.     In or around the first half of 2012, the Defendant and Wright traveled together by car to a project meeting.  The Defendant left behind in the car a spreadsheet that tracked the substantial payments the Defendant and Wright were receiving on Station Ridge.  Wright was surprised by the amounts he and the Defendant were obtaining on Station Ridge.

c.     In an email chain in or around July 2012 to individuals at Company B, the Defendant falsely claimed that Wright was trying to track down the initial payment Company B owed to Wright/P&E for the Company C Buildout.  At one point in the chain, the Defendant copied pandeservices.us@gmail.com, which the Defendant had falsely portrayed as Wright's email address, and the Defendant asked that all further emails in response also copy that email address.   The Defendant falsely claimed in the emails that Wright had left voicemails about not receiving the check.  In reality, Wright had received and already deposited the check on June 29, but was not aware of the purpose of the check when he received it.  Wright had thus misinformed the Defendant about the status of this check, leading to the Defendant's repeated inquiries of Company B to locate the check.

64.     On or about the dates set forth below, in the District of Columbia and elsewhere, the Defendant JOHN T. FITZGERALD, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| Count | On or About Date | Description |
|:---:|:---:|:---|
| 1 | June 6, 2012 | $42,760 check from the P&E Account payable to Onsight Management, which was deposited in the Onsight Management Account at a bank branch in Washington, D.C., causing interstate wire transmissions, including between Washington, D.C. and New Jersey. |
| 2 | November 6, 2012 | $24,927 check from the Blackwood One Account payable to Onsight Management, which was deposited in the Onsight Management Account at a bank branch in Bethesda, MD, causing interstate wire transmissions, including between Maryland, New Jersey, and Washington, D.C. |
| 3 | June 7, 2013 | $46,699 check from the Blackwood One Account payable to Onsight Management, which was deposited in the Onsight Management Account at a bank branch in Washington, D.C., causing interstate wire transmissions, including between Washington, D.C. and New Jersey. |

**(Wire Fraud, in violation of Title 18, United States Code, Section 1343)**

## COUNT FOUR
## (AGGRAVATED IDENTITY THEFT)
### (18 U.S.C. § 1028A)

65.     Between on or about November 17, 2011, and in or around June 2013, in the District of Columbia, the Defendant JOHN T. FITZGERALD did knowingly possess and use, without lawful authority, a means of identification of another person, that is, the name of Bryan Wright and the email address and account, pandeservicesus@gmail.com, and the alternate email address for that account, pandeservices.us@gmail.com, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, wire fraud under Title 18, United States Code, Section 1343, knowing that the means of identification belonged to another actual person, in violation of Title 18, United States Code, Section 1028A(a)(1).

**(Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A)**

**COUNT FIVE**
**(TAX EVASION)**
**(26 U.S.C. § 7201)**

66.     Between in or around January 2012 and on or about January 16, 2015, in the District

of Columbia and elsewhere, the Defendant JOHN T. FITZGERALD, a resident of Washington,

D.C., did willfully attempt to evade and defeat a large part of the income tax due and owing by

him to the United States of America for the calendar year 2012, by committing the following

affirmative acts of evasion, among others:

        a.      preparing and causing to be prepared, and signing and causing to be signed,

a false and fraudulent 2012 U.S. Individual Income Tax Return, Form 1040, which was

submitted to the Internal Revenue Service; and

        b.      preparing and causing to be prepared, and signing and causing to be signed,

a false and fraudulent 2012 Amended U.S. Individual Income Tax Return, Form 1040X,

which was submitted to the Internal Revenue Service; and

        c.      fraudulently misrepresenting his receipt of income to his return preparer;

and

        d.      directing income to be made payable to a nominee entity; and

        e.      depositing income into a bank account held in the name of a nominee entity.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

**COUNT SIX**
**(TAX EVASION)**
**(26 U.S.C. § 7201)**

67.     Between in or around January 2013 and on or about April 27, 2015, in the District

of Columbia and elsewhere, the Defendant JOHN T. FITZGERALD, a resident of Washington,

D.C., did willfully attempt to evade and defeat a large part of the income tax due and owing by

him to the United States of America for the calendar year 2013, by committing the following affirmative acts of evasion, among others:

      a.      preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent 2013 U.S. Individual Income Tax Return, Form 1040, which was submitted to the Internal Revenue Service; and

      b.      preparing and causing to be prepared, and signing and causing to be signed, a false and fraudulent 2013 Amended U.S. Individual Income Tax Return, Form 1040X, which was submitted to the Internal Revenue Service; and

      c.      fraudulently misrepresenting his receipt of income to his return preparer; and

      d.      directing income to be made payable to a nominee entity; and

      e.      depositing income into a bank account held in the name of a nominee entity.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

## COUNT SEVEN
**(CONSPIRACY TO ENGAGE IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY)**
**(18 U.S.C. § 1956(h))**

68.      Paragraphs 1 through 63 are incorporated here.

69.      From in or around late 2011, and continuing thereafter through in or around July 2014, within the District of Columbia and elsewhere, the Defendant JOHN T. FITZGERALD, together with Bryan Wright, did knowingly combine, conspire, confederate, and agree to violate Title 18, United States Code, Section 1957, that is, by engaging and attempting to engage in monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, which property was derived from a specified unlawful activity, that is, wire fraud.

## The Object of the Conspiracy

70.     The principal object of the conspiracy was to illegally enrich the co-conspirators.

## The Manner and Means of the Conspiracy

71.     It was part of the conspiracy that the Defendant JOHN T. FITZGERALD, and Bryan Wright, did knowingly engage in illegal monetary transactions totaling $672,781 involving the above-identified criminally derived property from wire fraud, by issuing checks to the Defendant (through Onsight Management), all for a value of greater than $10,000.  Wright made these checks payable to Defendant as follows:

| ON OR ABOUT DATE | AMOUNT | ACCOUNT |
|:---:|:---:|:---:|
| 12/23/2011 | $29,052.00 | Onsight Management Account |
| 12/30/2011 | $20,327.00 | Onsight Management Account |
| 3/1/2012 | $28,177.00 | Onsight Management Account |
| 4/18/2012 | $42,760.00 | Onsight Management Account |
| 5/1/2012 | $42,760.00 | Onsight Management Account |
| 6/5/2012 | $42,760.00 | Onsight Management Account |
| 7/2/2012 | $42,760.00 | Onsight Management Account |
| 7/2/2012 | $10,417.00 | Onsight Management Account |
| 8/10/2012 | $70,364.00 | Onsight Management Account |
| 9/19/2012 | $41,198.00 | Onsight Management Account |
| 10/23/2012 | $42,983.00 | Onsight Management Account |
| 11/1/2012 | $24,927.00 | Onsight Management Account |
| 11/19/2012 | $38,558.00 | Onsight Management Account |
| 1/22/2013 | $29,963.00 | Onsight Management Account |
| 1/30/2013 | $42,463.00 | Onsight Management Account |
| 2/26/2013 | $23,750.00 | Onsight Management Account |
| 3/26/2013 | $20,536.00 | Onsight Management Account |
| 5/3/2013 | $32,327.00 | Onsight Management Account |
| 6/3/2013 | $46,699.00 | Onsight Management Account |
| TOTAL:  $672,781.00 | | |

**(Conspiracy to Engage in Monetary Transactions in Property Derived From Specified Unlawful Activity, in violation of Title 18, United States Code, Sections 1956(h))**

## COUNTS EIGHT THROUGH THIRTEEN

### (ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY) (18 U.S.C. § 1957)

72.     Paragraphs 1 through 63 are incorporated here.

73.     On or about the dates and in the amounts set forth below, in the District of Columbia and elsewhere, the Defendant JOHN T. FITZGERALD did knowingly engage and attempt to engage in the following monetary transactions by, through, or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, which property was derived from specified unlawful activity, that is, wire fraud:

| Count | On Or About Date | Amount | Monetary Transaction |
|---|---|---|---|
| 8 | July 6, 2012 | $30,000.00 | Check No. 955 drawn from Onsight Management Account payable to BB&T bank for John Fitzgerald's home equity line of credit account no. XXXXXX5998 |
| 9 | August 10, 2012 | $25,075.00 | Check No. 977 drawn from Onsight Management Account payable to Apple Ford for the purchase of a pickup truck |
| 10 | August 15, 2012 | $28,177.00 | Check No. 980 drawn from Onsight Management Account payable to BB&T bank for John Fitzgerald's home equity line of credit account no. XXXXXX5998 |
| 11 | March 26, 2013 | $25,000.00 | Check No. 118 drawn from Onsight Management Account payable to John Fitzgerald |
| 12 | June 5, 2013 | $61,000.00 | Wire from Onsight Management Account to the Defendant's Personal Account |
| 13 | July 5, 2013 | $43,000.00 | Wire from Onsight Management Account to the Defendant's Personal Account |

**(Engaging in Monetary Transactions in Property Derived From Specified Unlawful Activity, in violation of Title 18, United States Code, Section 1957)**

## FORFEITURE ALLEGATION

74.     Upon conviction of any of the offenses alleged in Counts One through Three, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  The United States will also seek a forfeiture money judgment against the defendant of at least $713,806.

75.     Upon conviction of any of the offenses alleged in Counts Seven through Thirteen, the defendant shall forfeit to the United States any property, real or personal, involved in these offenses, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).   The United States will also seek a forfeiture money judgment against the defendant of at least $713,806.

76.     Upon conviction of any of the offenses alleged in Counts One through Three and/or Seven through Thirteen, the following specific property is subject to forfeiture:

a.      $279,500.00 from Bank of Georgetown account no. XXXXXX9885 held in the name of John T. Fitzgerald;

b.      $3,635.38 from Presidential Bank  account no. XXXXXX4539 held in the name of John T. Fitzgerald;

c.      2012 Ford F-250, VIN# 1FT7X2B62CEA95756;

d.      Real property located at 3284 N Street N.W., Washington, D.C. 20007; and

e.      Real property located at 3183 Longview Lane, Delaplane, Virginia 20144.

77.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property that cannot be divided without

difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the

value of the property described above, pursuant to Title 21, United States Code, Section 853(p)

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))**

A TRUE BILL:

FOREPERSON

ATTORNEY FOR THE UNITED STATES